# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28 (4) (c), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS AUTHORITY IN ANY OTHER CASE IN ANY COURT OF THIS STATE.

RENDERED: AUGUST 24, 2006
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2005-SC-0863-WC

DATE 9-14-06 ExPC Gravitt D.C.

DAVID RANCK                                                 APPELLANT


V.

APPEAL FROM COURT OF APPEALS
2005-CA-0529-WC
WORKERS' COMPENSATION NO. 03-01362


BRIAN GRAY;
UNINSURED EMPLOYERS' FUND;
HON. R. SCOTT BORDERS,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD                                 APPELLEES


## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

An Administrative Law Judge (ALJ) determined that the claimant was working as an independent contractor at the time of his injury and dismissed his application for benefits. At issue is whether the finding was erroneous as a matter of law. Also at issue is whether the decision must be vacated and further proceedings held on remand because a successor considered and overruled the claimant's petition for reconsideration. The Workers' Compensation Board (Board) and the Court of Appeals have affirmed, and we affirm.

David Ranck, the claimant, worked as a painter. After Neil Sulier accepted his bids, he painted part of the interior of a residence that Sulier owned, a room in a storage shed, and the basement. Sulier hired Brian Gray to renovate the exterior of the

house, which included repairing, bleaching, and staining the wood shake roof. After finishing his own work, the claimant reached an agreement with Gray to bleach and stain the roof. On June 28, 2003, the claimant fell from the roof and was injured.

The claimant's application for benefits listed Gray as being his employer. Gray did not have workers' compensation insurance, so the Uninsured Employers' Fund (UEF) was made a party. It maintained that Sulier was the employer and made him a party. Like Gray, he did not have workers' compensation insurance. The ALJ bifurcated the claim to consider whether the claimant was working as an employee or independent contractor when he fell and, if he was an employee, which defendant was his employer.

The claimant testified that he had been a painter for 35 years. His practice was to bid on jobs, estimating the amount of time it would take and charging $15.00 to $20.00 per hour plus materials. He had his own brushes and rollers and sometimes provided the paint. He testified:

> I paint whenever I feel like painting. If I'm tired, I go to sleep. And when I'm awake, if I got something to paint, I paint. That's what I like to do with my time . . . . I don't necessarily worry about how many days it's gonna take to do this or how many days its gonna take to do that. I do it for the project.

The claimant stated that Sulier paid him directly for the work that he bid, and he paid part of that amount to a helper. After finishing the interior painting on Sulier's house, he recommended bleaching the deck to kill mold before painting it, and Sulier and Gray agreed. He did not submit a bid for bleaching the deck but did perform the work and thought Sulier paid him directly.

The claimant stated that after he finished the deck he approached Gray about going to work for him and that Gray paid him for doing some odd jobs (cleaning gutters

and painting a doorjamb and small soffit). He learned that Gray had a number of jobs for which he planned to hire a painter and approached him. Gray agreed to pay $12.00 per hour and supply the beer if he would bleach and stain the roof. Sulier and Gray both purchased bleach, and Gray provided the stain. The claimant stated that no one told him what hours to work or when to take breaks. He generally worked as long as he wanted and as many days in a row as he wanted, keeping track of his hours. He stated that Gray paid him $100.00 on Friday, June 27, and encouraged him to finish the job over the weekend so that Gray could paint the deck on the following Monday. On Saturday, June 28, he worked alone from about 8:00 A.M. until about 6:00 P.M., when he slipped on some wet stained shingles and fell off the roof.

Paul Young was an electrician at the worksite. He testified that he overheard parts of conversations between Gray and Sulier and between Gray and the claimant. He had the impression that Gray agreed to provide beer and pay the claimant $12.00 per hour to perform some type of work but never saw Sulier or Gray pay him any money. He did not know whether the work was on the same house or another property. Young stated that he never asked the claimant to do any work for him but that Sulier did give him a check and instructed him to pay the claimant and another individual for painting the basement. He explained that Sulier told him the funds were tied up in a financial management company that would only disburse them "through somebody that was a legal contractor."

In December, 2003, the Uninsured Employers Fund (UEF) deposed Sulier. He stated that he intended to use the house as his residence and that he hired the claimant to paint the interior but provided the paint. He did not remember how much he paid the claimant but did not think it was enough to require a Form 1099 to be filed for

-3-

tax purposes. He testified that he hired the claimant to bleach the roof but later stated that he did not recall whether bleaching the roof was tied in to the work that Gray was doing. In any event, he did not ask Gray to hire the claimant or have him stain the roof. He stated that he did not pay the claimant directly for work on the roof. Instead, Gray billed him when each project was completed, and payments came from a trust fund. When cross-examined by Gray, Sulier stated that he did not recall a conversation with Gray about having the claimant bleach the roof but that they might have discussed it after the claimant finished the interior painting.

James Sherrow testified that he went to the house initially to work for an electrician. When he arrived, the claimant asked him to help him paint, instead. He stated that he and the claimant split $400.00 for painting the basement. Because he was supposed to be working for the electricians, Sulier paid them, and they paid him. He did not know who paid the claimant.

When deposed by the UEF, Gray testified that Sulier hired him to perform various projects to renovate the house. He asked Gray to pay for materials and labor and then to be reimbursed upon completion of each project. Gray testified that he did not hire anyone else to work with him and that he was a "one-man operation." After he had completed some of the work, Sulier asked him to purchase materials so that the claimant could stain the roof, to pay the claimant for his labor, and to be reimbursed for both. He insisted that he never hired the claimant and that it was Sulier who arranged for him to bleach and stain the roof.

When cross-examined by the claimant, Gray testified that he performs most renovation work himself but calls others when he needs help. When he does so, he generally pays them by the job rather than the hour. He stated that he billed Sulier

$5997.00 for bleaching, staining, and repairing the roof. He paid a portion of that amount to the claimant and two others but would not specify how much he paid to each. He estimated that the claimant would have received $880.00 if he had completed his portion of the work and that the amount was not based on an hourly rate.

When deposed by Sulier on April 24, 2004, Gray testified that he hired someone else to finish the job after the claimant fell. He testified that he used a number of "subcontractors" on the job for Sulier and paid them on completion of the job, some by the job and others by the hour. When he negotiated a price with a subcontractor, he would build an amount for his services into the estimates he gave Sulier. He arrived at the $880.00 estimate for the claimant based on the amount of time he thought it would take multiplied by $12.00 per hour. He instructed the claimant "to keep his hours" in the event that the work took more time than he had estimated. Gray also testified that he was working as a crew leader for John James at that time, with the authority to hire and fire employees. He had discussed with the claimant the hourly rate that he would earn if he, too, worked for James. He thought that Young probably overheard that conversation.

When cross-examined by the claimant, Gray testified that Sulier asked him to pay the claimant for his labor for staining the roof. Sulier had apparently paid the claimant already for bleaching the roof. Nonetheless, Gray billed Sulier for both bleaching and staining the roof, and the bank paid him in two installments. Gray testified that he was to reimburse Sulier for the duplicate payment but that Sulier later told him to keep the money. He stated that he billed the claimant's time at $20.00 per hour and paid him $12.00 per hour.

Sulier filed his own deposition of April 30, 2004. He testified that generally he

took the claimant's bids to the bank for approval before disbursing funds. He issued a $400.00 check to the claimant on June 3, 2003, for painting the basement. On or about June 18, 2003, he paid the claimant $600.00 for painting the loft and main floor. He thought he paid $300.00 in cash for exterior prep work bid on June 17, 2003, and was later reimbursed by the bank. Of that amount, $50.00 was for bleaching the deck, and $100.00 was for bleaching parts of the roof. None of the amounts was based on the amount of time the job took. Sulier stated that he would not have paid the claimant for bleaching the roof and then had Gray pay the claimant for the same work without expecting to be reimbursed or credited.

Cross-examined by the claimant, Sulier testified that he did not remember any discussion with Gray about double billing for work on the roof. Cross-examined by Gray, he testified that although he did not remember, it was likely that Gray purchased the materials and that he paid Gray upon completion of the project. He considered Gray to be the contractor and relied on him to get the correct people to do the work. He did not know what arrangement Gray had with the claimant.

After reciting the nine factors set forth in Ratliff v. Redmon, 396 S.W.2d 320 (Ky. 1965), the four predominant factors as set forth in Chambers v. Wooten's IGA Foodliner, 436 S.W.2d 265 (Ky. 1969), and analyzing the evidence under each factor, the ALJ determined that the claimant was working as an independent contractor at the time of his injury. Sometime thereafter, the ALJ's appointment ended. A different ALJ considered and overruled the claimant's petition for reconsideration, finding it to be "nothing more than a reargument of the merits." The claimant then appealed.

KRS 342.640 defines various classes of employees. In relevant part, it provides:

> The following shall constitute employees subject to the

-6-

provisions of this chapter, except as exempted under KRS 342.650:

> (1) Every person, including a minor, whether lawfully or unlawfully employed, in the service of an employer under any contract of hire or apprenticeship, express or implied, and all helpers and assistants of employees, whether paid by the employer or employee, if employed with the knowledge, actual or constructive, of the employer;

> . . . .

> (4) Every person performing service in the course of the trade, business, profession, or occupation of an employer at the time of the injury[.]

The claimant notes that the statute contains presumptions of employee status and asserts that Ratliff v. Redmon, supra, and its progeny are inapplicable when the facts fit one of the presumptions. He admits that he performed the inside work for Sulier as an independent contractor but asserts that he worked on the roof as Gray's employee. He argues that Gray was in the business of repairing and remodeling houses and had a time and materials contract to repair, bleach, and stain Sulier's roof. Gray hired him to bleach and stain the roof in furtherance of Gray's trade or business and admitted paying him $12.00 per hour while billing Sulier $20.00 per hour; therefore, the ALJ should not have considered the Ratliff v. Redmon, supra, factors because KRS 342.640(4) presumed him to be Gray's employee. He distinguishes Chambers v. Wooten's IGA Foodliner, supra, pointing out that a grocery was not in the business of repairing roofs, so KRS 342.640(4) did not presume it to be the employer of a worker that it hired to do so. Therefore, the factors were properly considered.

The worker has the burden to prove every element of a workers' compensation claim, including employee status at the time of injury. Roark v. Alva Coal Corporation,

371 S.W.2d 856 (Ky. 1963); Wolf Creek Collieries v. Crum, 673 S.W.2d 735 (Ky. App.1984); Snawder v. Stice, 576 S.W.2d 276 (Ky. App. 1979). Although the claimant is correct in asserting that KRS 342.640 contains various presumptions regarding a worker's status as an employee, his interpretation of KRS 342.640(4) is flawed. KRS 342.640(4) creates a presumption that an individual working in the trade or business of an employer is an employee, but it does not prohibit an employer from rebutting the presumption by showing that the individual is actually an independent contractor. In other words, the presumption is rebuttable and governed by KRE 301. See Magic Coal Co. v. Fox, 19 S.W.3d 88, 95 (Ky. 2000). If an employer fails to go forward with rebuttal evidence, the presumption allows the worker to prevail as a matter of law. If an employer does go forward with evidence to rebut the presumption, the ALJ must weigh the parties' evidence under the standard found in Ratliff v. Redmon, supra, and its progeny. In such instances, the worker retains the burden of persuading the ALJ that he is an employee. KRE 301; Magic Coal Co. v. Fox, supra.

Gray raised an independent contractor defense and presented evidence to rebut KRS 342.640(4); therefore, Ratliff v. Redmon, supra, applied. The nine Ratliff v. Redmon factors are: 1.) the extent of control that the alleged employer may exercise over the details of the work; 2.) whether the worker is engaged in a distinct occupation or business; 3.) whether the type of work is usually done in that locality under the supervision of an employer or by a specialist, without supervision; 4.) the degree of skill required by the work; 5.) whether the worker or alleged employer supplies the instrumentalities, tools, and place of work; 6.) the length of the employment; 7.) the method of payment, whether by the time or the job; 8.) whether the work is a part of the regular business of the employer; and 9.) the intent of the parties. The test was refined

-8-

in <u>Chambers v. Wooten's IGA Foodliner</u>, <u>supra</u>, which required consideration of all relevant factors with a primary focus on four: 1.) the nature of the work as related to the business generally carried on by the alleged employer; 2.) the extent of control exercised by the alleged employer; 3.) the professional skill of the alleged employee; and 4.) the true intentions of the parties.

When determining that the control factor favored independent contractor status, the ALJ noted the claimant's assertion that Gray urged him to finish the roof over the weekend but also noted that he worked on his own schedule, that he worked when Gray would not be present, and that any control was minimal. Regarding the second factor, the ALJ noted that the claimant had worked as a painter for 35 years but that Gray had also worked as a painter and that such work was part of renovation and remodeling. Therefore, the claimant's occupation was not distinct from Gray's, which favored employee status. Based on evidence that painting was done locally by either employees or independent contractors, the ALJ found the third factor to favor employee status. Likewise, although the claimant worked for 35 years as a painter, Gray acknowledged that it was not a skill that required substantial training; therefore, that factor favored employee status. Noting the mixed evidence regarding who supplied tools, the ALJ found the effect of the evidence to be neutral. The ALJ considered the possibility that the claimant would be hired for future work for John James to be unrelated to the roof project. Both parties testified that the claimant would only be working for Gray until the roof was stained, which favored independent contractor status. The ALJ did not find it unusual for a general contractor to bid a job at a higher rate than he would have to pay sub-contractors and concluded that the extensive evidence regarding method of payment was neutral. Acknowledging that

painting/staining was a regular part of Gray's business renovating and repairing houses, the ALJ found that factor to indicate employee status. Finally, the ALJ characterized the claimant's belief that he was an employee as being "unrealistic," noting that he would have expected to be paid by check and to have had taxes and social security withheld if he truly considered himself to be an employee. Weighing all of the factors, the ALJ determined that he was an independent contractor at the time of his injury.

The claimant continues to assert that the ALJ failed to understand that his arrangements with Sulier and Gray were separate and that although he was an independent contractor when working for Sulier, he was Gray's employee. He asserts that the ALJ misunderstood the evidence regarding some of the Ratliff v. Redmon, supra, factors and points to certain favorable evidence. He argues in particular that the ALJ erred by failing to consider his testimony showing that Gray had the right to control his work. We note, however, that the ALJ was not required to give any particular weight to the claimant's testimony that Gray told him to perform various odd jobs, particularly when faced with evidence to the contrary. See Grider Hill Dock v. Sloan, 448 S.W.2d 373 (Ky. 1969). Like the Board and the Court of Appeals, we are not convinced that the ALJ misunderstood the evidence or the claimant's arguments. The recitation of the evidence reveals a clear understanding that his arrangement with Gray to bleach and stain the roof was separate from his arrangement with Sulier to do painting. The ALJ weighed the evidence under each of the Ratliff v. Redmon factors and found that the claimant was working as an independent contractor when he was injured. Therefore, the claimant's burden on appeal is to show that the evidence of an employee relationship with Gray was so overwhelming that the decision was unreasonable. KRS 342.285; Special Fund v. Francis, 708 S.W.2d 641, 643 (Ky. 1986).

-10-

The Board conducted an exhaustive review of the evidence and considered each of the claimant's arguments carefully. It determined that the favorable evidence was not so overwhelming as to compel a decision in the claimant's favor, and the Court of Appeals affirmed. Having reviewed the evidence and the parties' arguments, we agree.

The claimant's second argument is that no statute or regulation permits a stranger to a case to rule on a petition for reconsideration and that due process prohibits the practice. He argues that it would be impossible for a subsequent ALJ to step into the predecessor's mindset, particularly regarding a petition that asserts a finding is the product of confusion and a misunderstanding of the facts. Moreover, to permit a stranger to rule on a petition would effectively grant the individual appellate powers or invite the individual to "rubber-stamp" the initial decision. He urges the court to adopt a procedural rule that "he who decides the case must also hear the case" and, on that basis, to set aside the decisions below, declare a "mistrial," apply CR 63, and remand his claim for "a new trial."

This argument is based on the misconception that the "trial" in a workers' compensation claim continues after the ALJ renders the decision. Although KRS 342.281 permits a party to petition for reconsideration, it states that the ALJ "shall be limited in review to the correction of errors patently appearing on the face of the award, order, or decision." Granted this limited scope of review, an ALJ may not re-weigh the evidence on a factual issue decided in the initial opinion. Wells v. Ford, 714 S.W.2d 481 (Ky. 1986); Eaton Axle Corporation v. Nally, 688 S.W.2d 334 (Ky. 1985); Beth-Elkhorn Corp. v. Nash, 470 S.W.2d 329 (Ky. 1971). Contrary to the claimant's argument, the same ALJ both heard this claim and decided it. A successor ALJ determined only that the claimant's petition for reconsideration showed no patent error

in the decision.

The claimant relies on Wells v. Ford, supra, in which the court determined that expiration of the 10-day period for review found in KRS 342.281 does not divest the fact-finder of authority to decide a petition for reconsideration. The court did not consider whether the same fact-finder must decide both the initial claim and a petition for reconsideration, and the claimant has pointed to nothing that would require as much. Moreover, this court has determined that nothing in the statutes or regulations requires a claim to be decided by the same ALJ throughout its life. See Tuttle v. O'Neal Steel, Inc., 884 S.W.2d 661, 663 (Ky. 1994).

CR 63 permits a successor judge to perform "the duties to be performed by the court under these rules after a verdict is returned or finding of fact and conclusions of law are filed;" however, it gives the successor discretion to grant a new trial if satisfied that the failure to preside over the trial would prevent performing those duties. In the present case, the successor ALJ determined that the circumstances did not warrant a new proceeding. Considering the scope of review afforded by KRS 342.281, we are convinced that the successor did not err or violate the claimant's due process rights by ruling on his petition.

The decision of the Court of Appeals is affirmed.

All concur.

COUNSEL FOR APPELLANT:

David B. Allen
P.O. Box 93
Versailles, KY 40383


COUNSEL FOR APPELLEE,
BRIAN GRAY, PRO SE:

Brain Gray
109 Crest Court
Nicholasville, KY 40356